61 So.2d 117

## LAKEY v. STATE.

### 8 Div. 632.

Supreme Court of Alabama.

Aug. 27, 1952.

Rehearing Denied Nov. 6, 1952.

Bradshaw & Barnett, Florence, and Smith & Tompkins, Tuscumbia, for appellant.

Si Garrett, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., and Maury D. Smith, Montgomery, of counsel, for the State.

SIMPSON, Justice.

Standford Lakey was convicted of the murder of his wife, Tommie Fields Lakey, and received a sentence of life imprisonment. He appeals from that judgment.

The evidence to establish the defendant guilty of taking his wife's life was circumstantial, but it pointed unerringly to him as the guilty agent. A short recital of the evidence for the State will demonstrate this. The couple had guests in their home for luncheon Sunday and they remained until about five o'clock, when they departed, leaving the defendant and his wife there alone. At this time Mrs. Lakey was asleep in the bedroom and defendant was reclining on the couch in the living room. He was not asleep. Some hour and a half or two hours later the defendant telephoned one of these guests at her home and said he wanted her and her husband "to come over there, that something had happened to Tommie," and when the couple then returned to the defendant's home, he was sitting in a chair in the living room and his wife, the deceased, was lying partly on the bed, dead. There was some blood and hair on the door facing leading from the living room to the bedroom, evidently one place she received an injury. The defendant stated that she was lying on the floor and he had kicked her in trying to get her to come to bed. He also said that he had put her on the bed after he kicked her. When being taken to jail, he told the sheriff he did not intend to kill her. There was evidence that at previous times he had struck her and threatened to kill her. He had told one witness some few months previous to the fatal occasion that he had beaten her the night before and that "I ought to go to the doctor's office now [where she worked] and drag her out and beat her brains out. I hate her and I am going to kill her yet.

I despise * * * that big fat slosh." When the witness queried, "Why do you live with her?" he said, "Well, it's a good living." At about the same time, he had told his wife in the presence of another witness, "I am going to kill you and plead insanity and get out of it. You don't think I am smart enough to do it but I will show you sometime." On these occasions he appeared to be drinking. One witness testified of occasions when he had beaten her and tried to choke her. The physician by whom she was employed testified he had seen her with a black eye and bruises on her body on numerous occasions. There was no evidence that anyone else was in the house when his wife was killed and his previously expressed ill will and manner of treatment and the statements made to the officers when they appeared on the scene make it conclusive beyond all doubt that defendant was guilty of her death.

The medical evidence from a doctor of long experience, whose qualifications were admitted, described the condition of the body. There were some cuts, bruises and scratches on her face extending into the scalp; a small cut on her nose, one cut on the upper lip and bruises over the face and each side of the neck; bruises on both arms and on one of her legs; one cut through and along the right eyebrow and above that another cut into the bone, with the skin peeled back; bruises over the chest wall and the abdomen was distended. On pressing the abdomen there was a "slushing sound, a bogginess indicating fluid"; there was a "crepitation" of bones over the left side of the chest and over the liver, fractured ends of bones rubbing together causing the same; there was a softness over the right side of the liver and there was no resistence from the ribs; numerous bruises were over both sides of the chest wall and back and considerable disfiguration; the ribs would push in and offer no resistence on pressure and the same slushing sound was exhibited on pressure on the chest wall; also "crepitation of broken bones" over both sides of the chest wall. An autopsy disclosed that on opening the cranium the scalp was thickened from bruises but there were no bone fractures;

when the chest wall was opened it was shown that the thoracic cavity and both lungs had collapsed; there were fractures of the ribs from the back which tore into the lung cavity on both sides, every rib on the right side from the seventh down being completely fractured and torn into the pleural cavity; some ribs on the left side were also fractured completely and also torn into the pleural cavity; there was a considerable amount of blood in the right chest cavity and the abdomen, grossly about five or six pints of free blood in the abdominal cavity; the liver was also fractured in two places and a good sized part of the liver was torn loose completely. It was the opinion of this medical expert that some forcible blow produced the fracture of the liver and that death resulted from a forcible injury of some type and that the fracture of the liver as well as shock could have produced death; that these injuries were produced by some forcible blow which could have been caused from a man's fists or by kicking or stomping the body or by throwing it against a door facing.

The indictment was in five counts charging the defendant with murder in the first degree (1) by stomping his wife with his foot, (2) by kicking her with his foot, (3) by beating her with his fists, (4) by some means unknown to the grand jury, (5) by throwing her body into, upon or against a door facing. Just exactly the means which produced death is left to inference from the circumstances, but a verdict under any of the counts would have been proper. A general verdict was rendered.

The defendant did not testify and his principal defense was rested on insanity and drunkenness in mitigation of punishment. There was evidence that his mother had at one time been confined in a mental institution and that her brother, his uncle, had been an inmate of such an institution for many years; that the defendant in childhood had been of a moody disposition and sometime recently had received a lick on the head which affected his power of balance and orientation and that since having received this lick on his head, liquor unduly affected him. There was countervailing testimony of lay witnesses that in

120

their opinion defendant was normal and the defendant's superintendent where he worked testified that although he was slow in doing his job, he was a fairly good worker, and seemed to be normal mentally. Some lay witnesses testified that in their opinion defendant was not normal mentally, but this evidence—all of it—went to the jury for decision of the question of insanity or drunkenness to reduce the grade of the crime.

There was expert opinion evidence that the defendant was insane, but the probative force of this expert opinion evidence to overrule the presumption of sanity was also a question exclusively for the jury. Reedy v. State, 246 Ala. 363, 20 So. 2d 528; Hockenberry v. State, 246 Ala. 369, 20 So.2d 533; Lee v. State, 246 Ala. 343, 20 So.2d 471; Parsons v. State, 81 Ala. 577, 2 So. 854.

The law on insanity as a defense to a criminal charge is so well recognized that we will advert to it only briefly. Generally, mere weakness of mind alone does not negative discriminating intelligence as to render a person irresponsible for crime. Hall v. State, 248 Ala. 33, 26 So.2d 566. Neither abnormality nor subnormality precludes liability for crime where there exists sufficient mental capacity to entertain the requisite criminal intent. As excuse for crime the defendant must show clearly to the reasonable satisfaction of the jury that he was so afflicted by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental duress he could not resist doing the wrong; and the crime must have been the product solely of such diseased mental condition. Wingard v. State, 247 Ala. 488, 25 So.2d 170; Grant v. State, 250 Ala. 164, 33 So.2d 466.

Just what motive prompted the defendant's antipathy toward his wife does not appear. But it is firmly established in this jurisdiction that there is no recognition in our law of emotional insanity as an excuse for crime. Reedy v. State, supra.

On the question of intoxication at the time of the homicide so as to reduce the grade of the crime, this was also clearly for the jury's decision on the evidence submitted. Just how drunk the defendant was when he killed his wife is left in doubt. But when the officers arrived after the defendant's telephone call to one of his guests, he talked rationally, athough he did appear to be under the influence of whisky. So whether at the time of the homicide he was so intoxicated as not to have been able to form an intent was a matter to be determined by the jury. Ivory v. State, 237 Ala. 344, 186 So. 460.

The issue, therefore, of insanity as excuse for the crime and drunkenness as in mitigation were questions of fact for the determination of the jury. They were decided adversely to the defendant. The verdict was well founded. We hold, therefore, that neither the affirmative charge nor a new trial on the weight of the evidence was due the defendant.

The proposition argued most cogently as error to reverse relates to the ruling of the trial court in permitting the solicitor to read to the jury certain testimony which had been transcribed by the court reporter. In his closing argument the solicitor made some reference to "fist marks" on the throat of the deceased, which was objected to by defense counsel as not being in the evidence, the solicitor then stating "I will read it all in a minute." Then over due objection and exception, he was allowed to read the testimony of the doctor detailing the extent of the injuries to the body of the deceased and his opinion as to the cause of death; he was also permitted to read that part of the testimony of the other two witnesses relative to threats made by the defendant against the deceased, to which we have above referred. After the reading of this testimony the court overruled the motion to exclude and for a mistrial and then called to the stand the court reporter, who was sworn and testified that the solicitor had read from her transcribed notes and that they had been correctly transcribed. The court then admonished the jury that they were not to consider that testimony "any more than any of the other testimony" and that it should

"be considered along with the other arguments in the case."

On the hearing of the motion for a new trial, the court went into further explanation that the solicitor was permitted to read the testimony of the doctor "recapitulating the injuries suffered by the deceased together with the doctor's opinion as to the cause of the death" as answer to the argument of defense counsel that deceased might have inflicted the injuries on herself; that counsel "had stated to the jury in effect that there was no evidence whatsoever that defendant had killed her by 'kicking her with his foot,' or as charged in another count 'by stomping her with his foot,' or as charged in another count 'by throwing her against a door facing,' each count being so dealt with by defense counsel, who read from the indictment the particular part in each count dealing with the manner by which death was produced." With respect to the testimony of the threats, the court explained this was allowed to be read to the jury in answer to the argument of defense counsel that "there was a presumption of innocence in the defendant's favor arising from the marital relationship—the relationship of husband and wife."

The practice of permitting attorneys to read testimony from the court reporter's transcription has been denounced in Mississippi (and perhaps one other jurisdiction) as giving undue emphasis to such evidence without the privilege of the defendant being able to answer and as placing the seal of "absolute accuracy and verity" on such testimony. Davis v. State, 85 Miss. 416, 37 So. 1018. But even in that case the court did not and seemed unwilling to pronounce the matter as error to reverse. This court seems to have stated no rule on the subject. The proposition was referred to by the Court of Appeals in Richardson v. State, 21 Ala.App. 639, 111 So. 202, that court indicating that the solicitor might refer to such data to refresh his recollection in his argument to the jury, but that it was proper to exclude "from the jury the statement of the solicitor that he was reading from the stenographer's notes." This observation was not necessary to a decision and hence no binding rule of practice was thereby enunciated.

Vol. 23 C.J.S., Criminal Law, § 1092a, page 544, carries this statement:

"Although there is authority to the contrary, it is generally held that an attorney may refresh his recollection of evidence by reading from the notes of the official reporter, and that it is not improper for the prosecuting attorney, during his argument, to read the evidence from a stenograher's minutes, particularly where it is admitted that the evidence so read is that given on the trial and embraced in the record * * *."

A reading of the cases cited in support of the text discloses some qualifications and refinements of this general statement, but, in the main, it is our opinion that the principle is sound.

Frankly, we do not perceive that ordinarily a defendant could be prejudiced by an attorney presenting to the jury with accuracy the testimony of a witness rather than trusting to the inaccuracy of human recollection. Usually, it could but promote justice if the triers of fact understand and remember with accuracy the evidence upon which the case must rest, whether their recollection be refreshed by a memorandum made by the attorney or by the correctly transcribed notes of the court reporter, the truth being what the parties seek after. The average solicitor with customary eloquence could emphasize the evidence to greater effect and influence the jury more to the State's advantage by garnishing the facts from his own recollection than by reading the cold transcription of the testimony. And the mere calling of the court reporter to testify in no way puts the stamp of official approval on the testimony or certifies its verity, but merely attests the accuracy of its transcription.

It must be remembered that since the adoption of Supreme Court Rule 45, Code 1940, Title 7, Appendix, substantial error is not presumed, but the burden is upon the appellant to show it. Before a reversal of the judgment may be had it must

appear to the court that the error complained of has probably "injuriously affected the substantial rights of the parties." Henderson v. Tennessee Coal, Iron & R. Co., 190 Ala. 126, 67 So. 414, 415; Kabase v. State, 244 Ala. 182, 12 So.2d 766.

It is our view that the exigencies of the trial in each case should determine the propriety *vel non* of permitting this character of argument to the jury and its extent, to be controlled by the trial court in the exercise of a wise discretion. State v. Ragan, 123 Or. 521, 262 P. 954, 957.

Review here, then, will be to determine whether or not by the stated action the trial judge abused the discretion soundly vested in him to see that the defendant was not prejudiced by any unfair tactics of the prosecuting attorney. Clearly the answer must be in the negative. The jury determined the question of insanity and drunkenness in mitigation against the defendant, thereby concluding that he was neither excusable for the crime by reason of insanity nor entitled to have the grade of the crime reduced by reason of his drunkenness. With these two defenses out, it can at least be asserted with certainty that the verdict rendered was proper under the evidence and that no prejudice intervened by the stated conduct of the solicitor.

The court has considered the other errors relative to the remaining portions of the argument of the solicitor and has concluded that these rulings were likewise proper. The trial judge was careful to exclude all argument of doubtful propriety and charged the jury not to consider it when they deliberated. It is unnecessary to deal specifically with each of these objections.

Nor do we find that this case presents at all the situation discussed in Blue v. State, 246 Ala. 73, 19 So.2d 11, where the cumulative effect of improper argument of the attorney prosecuting for the State produced such prejudice against the defendant that the trial court's admonishment to the jury not to consider such argument was ineffective to eradicate the harm done. Some of the argument of the solicitor was justified, even though excluded by the court, and in respect to all of it the peremptory instructions to the jury that they should not consider it in making up their verdict was sufficient to eradicate any prejudice to the defendant.

We have dealt with the propositions most earnestly argued as grounds for a reversal. The remaining propositions advanced as error relate to refused charges and the general oral charge of the court. We will deal with them briefly.

■■■■ Charges 55 and 70 purporting to instruct the jury to be "cautious" in considering (or receive with "great caution") certain evidence bearing on motive were refused without error. They were invasive of the province of the jury. State v. Smalls, 98 S.C. 297, 82 S.E. 421(12). Charges which instruct the jury to consider any evidence with great caution or with less caution or to accord it greater weight or less weight are customarily denounced as invading the jury's province, which is to weigh and consider all the evidence and give it that credence it is due—their exclusive prerogative. Welsh v. State, 96 Ala. 92, 11 So. 450; Jones v. State, 183 Miss. 408, 184 So. 810; People v. Wagner, 29 Cal.App. 363, 155 P. 649(9); State v. Bartley, 337 Mo. 229, 84 S.W.2d 637(5); 23 C.J.S., Criminal Law, § 1161, note 83, page 698; State v. Simas, 25 Nev. 432, 62 P. 242 (11); Robinson v. State, 17 Ga.App. 751, 88 S.E. 410(3). See also Johnson v. State, 223 Ala. 332, 135 So. 592; State v. Smalls, supra. While the charges do embrace some language extracted from opinions of the court, see Baalam v. State, 17 Ala. 451; Spicer v. State, 188 Ala. 9, 65 So. 972, this does not avert the stated criticism. It has been often pointed out that lifting language from an opinion and embodying it in a written charge does not of itself make it a correct instruction to the jury. Southern R. Co. v. Dickson, 211 Ala. 481(30), 100 So. 665; Harper v. State, 16 Ala.App. 153, 75 So. 829; 23 C.J.S., Criminal Law, § 1192, note 60, page 739; Lisansky v. United States, 4 Cir., 31 F.2d 846, 67 A.L.R. 67(12); People v. Rutigliano, 261 N.Y. 103, 184 N.E. 689(3); People v. Adams, 76 Cal.App. 188, 244 P. 114(3); Porter v. State, 180 Ga. 147, 178 S.E. 151(2).

Charges 40 and 67 seeking to instruct the jury that there was an added presumption of innocence arising from the conjugal relation was denounced as erroneous by this court at an early day. Hawes v. State, 88 Ala. 37, 72, 7 So. 302, 314. In that case the elder Justice McClellan, later Chief Justice, observed:

"The law presumes innocence of crime in all cases until the contrary is shown. But we know of no principle upon which to this general presumption of innocence, other presumptions, depending on the relations which the alleged criminal bore to the victims of the crime, could be added. * * * The presumption is single, and the same in all cases, and in all must be overturned by evidence which excludes every other reasonable hypothesis than that of guilt. Beyond this, whatever the relations of the alleged author and the victim of the act charged, the prosecution need not go. * * *"

We do not regard Spicer's and Baalam's cases, supra, as opposed to this principle. Spicer's case took no notice of the Hawes case and, like Baalam, was discussing a different principle.

Charges 27, 28, 32, 33, 34, 38 and 39 are incorrect statements of the applicable law. They were properly refused. Ellis v. State, 246 Ala. 300, 20 So.2d 512; Cagle v. State, 211 Ala. 346, 100 So. 318.

Charges 7, 10, 11, 14 and 20, seeking to instruct on circumstantial evidence, if correct, were amply covered in other given charges and the general oral charge.

It is not necessary to discuss separately the other refused charges. They were either incorrect statements of law, argumentative or misleading, or were amply covered in other given charges and the oral charge of the court.

Several exceptions are taken to portions of the court's oral charge, but we find no merit in these exceptions. The summary of the law of insanity given by the court, when taken in connection with the preceding portion of the charge, correctly exposited the law on the question and the claim of error is untenable.

Consistent with our duty in such cases, we have carefully studied the record in consultation and the various points of error pressed on us by able counsel for the defendant, but have concluded that the trial proceeded throughout without prejudicial error and the judgment must stand.

Affirmed.

All the Justices concur except BROWN, J., not sitting.